**STATE of Missouri, Respondent,**

v.

**Dave ROSS, Appellant.**

**No. 49748.**

Supreme Court of Missouri,

Division No. 2.

Sept. 9, 1963.

Motion for Rehearing or for Transfer to Court En Banc Denied Oct. 14, 1963.

Lee D. Seelig, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., Jefferson City, Dale Reesman, Sp. Asst. Atty. Gen., Boonville, for respondent.

STORCKMAN, Presiding Judge.

The defendant Dave Ross, charged with second-degree murder, was found guilty of manslaughter and his punishment was assessed at imprisonment for a term of ten years. His motion for new trial was overruled and he was sentenced in accordance with the verdict.

The defendant was represented in the trial court as well as here by counsel of his own choice. He raises two principal issues on appeal. First he contends that the court erred in refusing to sustain his motion for a judgment of acquittal because the state failed to prove either a criminal act or the criminal agency of the defendant. The other complaint is that the trial court committed prejudicial error in requiring a witness to testify in violation of her claim of self-incrimination and in ordering her to be taken into custody for refusal to testify.

Circumstantial evidence is sufficient to support a conviction of homicide. State v. Meidle, Mo., 202 S.W.2d 79, 81 [2]. In determining the sufficiency of the evidence to make a submissible case, it must be viewed in the light most favorable to the state. State v. Davis, Mo., 367 S.W.2d 517, 519[2].

On March 5, 1962, an automobile ran against a drug store at 35th and Woodland in Kansas City, Missouri, breaking the front window; Clifton Fuquay staggered into the store, fell to the floor, and died almost immediately. An autopsy revealed that he had been shot. A .22 caliber bullet found lodged between the second and third cervical vertebra was the cause of his death. The bullet entered on the right side of his neck below the jawbone about three inches from the ear and "ranged up in and back". No gun was found on his person, in his automobile, or in the vicinity of the casualty. Under the evidence the jury could reasonably find that the death of Clifton Fuquay was the result of a criminal act. State v. Meidle, Mo., 202 S.W.2d 79, 81[5]; State v. Campbell, 301 Mo. 618, 257 S.W. 131, 132[1]; State v. Hall, Mo., 231 S.W. 1001, 1004[9].

The criminal agency of the defendant was also sufficiently proved. For about six months prior to the episode in question, the defendant, aged 27, and Mrs. Sharon Gunter, also known as Sharon Pollard, aged 24, had been living together at 2623 Bales in Kansas City although they were not married to each other. During the evening of March 4, 1962, the defendant and Mrs. Gunter were together in a cafe known as the Cubby Hole on Prospect, just south of 27th Street. While the defendant was out of the cafe for a short time, another colored man, later identified as Clifton Fuquay, talked to Mrs. Gunter and made an engagement to see her about an hour later at 2623 Bales. The defendant had seen them talking and when he returned Mrs. Gunter told him of the incident. Shortly thereafter the defendant and Mrs. Gunter went to the Bales address. When Fuquay arrived the defendant went into the kitchen; Mrs. Gunter answered the door and let the caller in. Fuquay inquired if they were alone and when he learned the defendant was in the apartment, he declined to complete his mission. Mrs. Gunter then gave Fuquay her grandmother's telephone number so they "could get together some other time" and Fuquay left. The next morning as the defendant was leaving the house to seek employment driving a taxi cab, Fuquay drove by, picked up the defendant, and took him to work. Shortly thereafter Fuquay returned to 2623 Bales. Mrs. Gunter was still in bed and when she did not respond to his knocking, Fuquay broke in the front door. He offered her money but she was frightened by his conduct, and when she asked him to leave he slapped her, called her "a white bitch", tore her robe, and forced her to have intercourse with him. The defendant returned a few minutes after Fuquay left and Mrs. Gunter told him what had happened excepting the act of intercourse. Shortly before noon Mrs. Gunter went to her grandmother's home and the defendant went to the Cubby Hole.

At about 7:30 that evening the defendant saw Fuquay sitting in his parked car near the home of Mrs. Gunter's grandmother; he told Fuquay he wanted to talk to him. The defendant got into the automobile with Fuquay and while they were riding about an altercation occurred which resulted in Fuquay being shot. The defendant jumped from the moving car before it crashed into the front of the drug store where Fuquay died. According to the state's evidence, the defendant denied knowing anything about Fuquay or the manner of his death when he was arrested on April 12, 1962, more than a month after the happening. The police officers then confronted the defendant with Mrs. Gunter who had made a statement to the police, after which the defendant talked to the police officers about the killing of Fuquay but did not give them a written statement. In substance the defendant told the police officers that when he got in Fuquay's car he had in his belt a .22 caliber gun belonging to his brother Melvin; that during the talk about Mrs. Gunter the defendant reached for his gun, Fuquay slapped at him, and when the defendant pulled his gun Fuquay grabbed his arm, the gun went off, Fuquay fell back against the seat, and the defendant jumped

from the car. The defendant's brother Melvin testified that his .22 caliber revolver was missing and that the defendant told him that he had taken the gun from Melvin's dresser drawer two or three weeks before the shooting. The defendant admitted that later in the night of March 5, 1962, in the company of his brother Lonnie, Mrs. Gunter, and Wanda Teagarden, he disposed of the weapon which fired the shot that killed Fuquay by throwing it into the Blue River from the bridge on Highway 40. He testified, however, that he had no gun when he got into Fuquay's car; that he tried to get Fuquay to apologize to Mrs. Gunter for what he had done; that while they were fighting in the car, Fuquay pulled a gun which he held in his right hand; that the defendant grabbed Fuquay's right arm and hand, turned the gun toward Fuquay, and the gun was discharged; that the defendant picked up the gun and jumped from the moving car before it crashed into the drug store. The state's version of the shooting was amply corroborated. The evidence was clearly sufficient to prove the defendant's criminal agency.

We have examined the cases cited by the defendant and find them to be entirely consistent with the conclusions we have reached with respect to the first point on this appeal. The defendant is mistaken in his contention that the only evidence of what happened at the time of the shooting was his testimony and that it tends to prove the shooting was accidental. It was for the jury to believe or disbelieve the defendant's evidence tending to exculpate him. State v. Tourville, Mo., 295 S.W.2d 1, 5[4]. The trial court did not err in refusing to direct a verdict of acquittal.

The defendant's final contention is that the court erred in failing to sustain the defendant's motion for a mistrial when Mrs. Sharon Gunter, on the stand as a state's witness, refused to answer certain questions on the ground of self-incrimination, and the court in the presence of the jury directed the sheriff to arrest the witness and stated in a loud voice, "This is not the grand jury." The statement of the point further asserts that the action of the court was particularly prejudicial "considering the sordid relationship of this witness and the defendant, without according the witness the right to have the court interrogate her to ascertain what answers were incriminating."

Mrs. Sharon Gunter was the second of ten witnesses called by the state. She testified that the defendant was her "boy friend" with whom she was living on March 5, 1962. When asked if she was acquainted with one Clifton Fuquay, she refused to answer the question on the ground that it would tend to incriminate her. Thereupon the court told her, "You will answer that question, this is not the grand jury." When the witness persisted in her refusal, the court ordered the jury taken from the courtroom and there was further interrogation of the witness out of the presence of the jury. The state was given leave to examine her further as a hostile witness and her interrogation was continued in the presence of the jury. She again refused to say if she was acquainted with Clifton Fuquay. In response to other questions, she stated that she had made a full and complete statement to the police officers on April 12, 1962. This written statement was admitted in evidence over an objection limited to the competency of paragraph 2 concerning the occurrence in the cafe on the evening of March 4. The statement covering six pages of the transcript is quite detailed and is consistent with other evidence of the state including the later testimony of Mrs. Gunter. Thereafter, the witness was questioned further by the prosecuting attorney. She answered some questions and declined to answer others. Defense counsel then cross-examined Mrs. Gunter and she responded to all of his questions. At the conclusion of the cross-examination, the following occurred:

"THE COURT: Just a moment. Sheriff, don't leave, please. Take this witness

to jail in contempt of this court. Leave her there until I call for her.

"MR. SEELIG: Just a minute.

"THE COURT: Take the witness, Sheriff, up to jail, she is in contempt of this court.

"MR. SEELIG: I am going to object to that being done in the presence of the jury, it inflames and prejudices the jury to cite a witness for contempt in the presence of the jury by the remarks of his Honor, I move this jury be discharged.

"THE COURT: Overruled. Go ahead, Sheriff."

At 1:30 on the following day Mrs. Gunter appeared with her attorney and advised the court that she wished to testify and purge herself of contempt. The jury was then called and Mrs. Gunter responded to all questions propounded both on direct and cross-examination. There was no further reference to the previous incident and, among other instructions, the jury was given the usual one that they were the sole judges of the credibility of the witnesses and the weight and value to be given their testimony.

◼ The appellant's brief in this regard deals with the right of a witness to refuse to testify on the ground that his answers might incriminate him, citing such cases as Presta v. Owsley, Mo.App., 345 S.W.2d 649; Ex parte Arvin, 232 Mo.App. 796, 112 S.W.2d 113, and State ex rel. North v. Kirtley, Mo., 327 S.W.2d 166. The respondent's brief properly pointed out that a witness's claim of privilege against self-incrimination was personal to him, and even though the court failed to grant the witness his constitutional immunity, the defendant has no ground for complaint unless his own rights were violated. State v. Shepard, 334 Mo. 423, 67 S.W.2d 91, 95[8]; State v. Foster, Mo., 349 S.W.2d 922, 924 [6].

In his reply brief the defendant cites State v. O'Connor, 105 Mo. 121, 16 S.W. 510, and State v. Bresse, 326 Mo. 885, 33 S.W.2d 919. In the O'Connor case the trial court ordered the prosecuting witness taken into custody on a charge of perjury before the defendant had an opportunity to cross-examine him and instructed the jury to wholly disregard the witness's testimony and the court's action in committing him. The supreme court held that the trial court had no right to withdraw the testimony from the consideration of the jury and to determine that the witness was unworthy of belief, thereby invading the jury's province and further that it was error to deprive the defendant his right of cross-examination. In Bresse it was also held that striking the testimony of a state's witness and the refusal to permit cross-examination was error. The narrower question here involved is whether the conduct and remarks of the trial judge were prejudicially erroneous and deprived the defendant of a fair and impartial trial.

◼ The conduct and comments of a trial judge during the examination of witnesses in a criminal case do not constitute grounds for a new trial unless such conduct and remarks are of such a nature as would reasonably tend to prejudice the minds of the jury against the defendant and thereby deny him a fair and impartial trial. State v. Brotherton, Mo., 266 S.W. 2d 712, 717[7]; State v. Moore, Mo., 303 S.W.2d 60, 67[6].

◼ A trial court may punish for contempt of court if necessary, even in the presence of the jury. State v. Montgomery, Mo., 223 S.W.2d 463, 469[18]. Not every utterance of doubtful propriety made by the court during the course of the trial results in prejudice, and whether the defendant's rights were violated must be determined from the whole record. State v. Hyde, 234 Mo. 200, 136 S.W. 316, 332.

◼ It must be conceded that the trial court's handling of the contumacious wit-

ness was inept and not to be recommended. The same effect could have been achieved without risking the injection of prejudicial error. Nevertheless we are convinced on the whole record that the incident did not deprive the defendant of a fair trial. On behalf of the state, Lonnie and Melvin Ross, brothers of the defendant, testified as to the ownership of the gun and the defendant's throwing it into the river after the crime had been committed. Wanda Teagarden, a friend of Sharon Gunter, also testified with respect to the defendant's conduct following the shooting. Several police officers testified with respect to damaging admissions made by the defendant following his arrest on April 12. It is apparent that Mrs. Gunter's refusal reflected on her alone. It further appears from the record that Mrs. Gunter's subsequent testimony, consistent with her statement to the police, erased any unfavorable effect her prior refusal to testify might have had on the jury. The defendant testified in his own behalf and was permitted to present fully his own case as well as to cross-examine all of the state's witnesses. The defendant was not prejudiced by the action of the court and was not deprived of a fair trial. State v. Montgomery, Mo., 223 S.W.2d 463, 469[19]; State v. Moore, Mo., 303 S.W.2d 60, 67–68[7–9]; Woodring v. United States, 8 Cir., 311 F.2d 417, 420 [1–3]. A quite similar incident was held not to be error justifying the grant of a new trial in State v. Sheffield, 55 N.M. 150, 228 P.2d 431. The trial court did not err in refusing to grant the defendant's motion for a mistrial.

We have considered all of the specifications of error presented on appeal and find them to be without merit. The defendant was present throughout the trial including his allocution and sentencing. We have also examined the parts of the record and entries designated in S.Ct. Rules 28.02 and 28.08, V.A.M.R., and find them to be proper in form and free from error. Accordingly the judgment is affirmed.

All of the Judges concur.